2023 IL App (3d) 220008

Opinion filed October 26, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| FIRST MIDWEST BANK, a Division of Old National Bank, Administrator of the Estate of Hunter Matney, Deceased; KAYLA COMER, Individually; and ALLEN MATNEY, Individually, | ) ) ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| OTTAWA REGIONAL HOSPITAL AND HEALTHCARE CENTER, d/b/a OSF Saint Elizabeth Medical Center, d/b/a Saint Elizabeth Medical Center, and HARSHAVADAN VYAS, M.D., | ) ) ) ) ) ) ) | Appeal No. 3-22-0008 Circuit No. 19-L-128 |
| Defendants | ) ) | |
| (Ottawa Regional Hospital and Healthcare Center, Defendant-Appellee). | ) ) | Honorable Troy D. Holland, Judge, Presiding. |

JUSTICE PETERSON delivered the judgment of the court.
Justice Brennan specially concurred, with opinion.
Justice McDade concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     Plaintiffs, First Midwest Bank (as the administrator of the estate of Hunter Matney), Kayla

Comer, and Allen Matney (Matney), filed a medical malpractice action against defendants, Ottawa

Regional Hospital and Healthcare Center (referred to hereinafter as OSF, OSF Hospital, or the hospital) and Dr. Harshavadan Vyas, relating to an alleged negligently delayed cesarean section (C-section). In count IV of the third amended complaint, plaintiffs claimed that the hospital was vicariously liable for Vyas's alleged negligence because Vyas was the apparent or actual (implied) agent of the hospital. The hospital disputed the existence of an agency relationship and filed a motion for summary judgment on that issue. Following a hearing, the trial court found that plaintiffs had failed to present sufficient evidence to establish that Vyas was the apparent or implied agent of the hospital and granted summary judgment for the hospital on count IV of plaintiffs' third amended complaint on that basis. Plaintiffs appeal. We affirm the trial court's ruling and its grant of summary judgment as to plaintiffs' apparent agency theory, reverse the trial court's ruling and its grant of summary judgment as to plaintiffs' implied agency theory, and remand this case for further proceedings.

¶ 2                                     I. BACKGROUND

¶ 3        On July 31, 2018, at around 11 a.m., plaintiff, Comer, went to the emergency room at OSF Hospital in Ottawa, Illinois, with what she thought were false labor pains. Comer was approximately nine months pregnant at the time and had just recently started seeing Vyas, a board-certified obstetrician and gynecologist (ob-gyn), for her prenatal care as to the current pregnancy. The hospital admitted Comer, and she was attended to by the on-call obstetrician, who happened to be Vyas. Vyas and the delivery workers at the hospital monitored Comer's and the baby's condition with the plan to deliver the baby by C-section after enough time had passed since Comer's last meal. Shortly before 4 p.m., however, after the baby had stopped being as active, the delivery workers lost the baby's heartbeat. Comer was rushed to the operating room, and Dr. Vyas performed an emergency C-section and delivered the baby, who was later named Hunter Matney

2

(Hunter). It was subsequently determined that Hunter had suffered a severe brain injury due to a lack of oxygen that had allegedly occurred during the labor and delivery process.

¶ 4　　　　In September 2019, Comer (individually and on behalf of Hunter) and Matney (Hunter's father) filed the instant medical malpractice action against the hospital and Vyas. The complaint was amended several times. During the course of the proceedings, First Midwest Bank became Hunter's guardian and was added or substituted into the case as an additional plaintiff.[1] In count IV of the third amended complaint, the operative complaint in this case, plaintiffs alleged that Vyas was negligent for failing to perform the C-section earlier, that Hunter was injured as a result of Vyas's negligence, and that the hospital was vicariously liable for Vyas's negligence because Vyas was the apparent or actual (implied) agent of the hospital.[2]

¶ 5　　　　The hospital disputed the existence of an agency relationship and filed a motion for summary judgment on that issue.[3] Plaintiffs filed a response and opposed the motion for summary judgment, and the hospital filed a reply. The parties attached numerous supporting documents to their pleadings, including portions of the deposition testimony of Comer, Matney, and Vyas and several pieces of documentary evidence. The evidence contained in those supporting documents, relative to the issue of agency, can be summarized as follows.

¶ 6　　　　Plaintiff, Comer, testified in her deposition that Vyas had previously been her doctor and had delivered a prior child of hers (other evidence showed that the prior delivery took place in

---

[1]Hunter passed away during the pendency of this appeal, and the caption of this case was again changed to reflect that First Midwest Bank had become the administrator of Hunter's estate.

[2]Although plaintiffs also alleged that Vyas was an employee of the hospital, no evidence to support that particular allegation was presented in the summary judgment proceeding, and it does not appear that plaintiffs proceeded forward on that allegation.

[3]The hospital's motion for summary judgment was originally filed as to plaintiffs' second amended complaint. In its ruling on the motion, however, the trial court granted plaintiffs' pending request for leave to file a third amended complaint, which contained a specific count that alleged vicarious liability (count IV). The trial court then treated the summary judgment motion as pertaining to the third amended complaint.

2013). Comer switched to a doctor in Morris, Illinois, for the delivery of her next child, who was born in 2016.

¶ 7    When Comer became pregnant with Hunter, she was living in Kentucky with Matney and their children. The family moved back to Illinois in May 2018, however, because Comer did not have insurance coverage to have the baby delivered in Kentucky. Comer was six or seven months pregnant at the time and had not had any prenatal care. The family took up residence in Ottawa with Matney's father and stepmother. Comer intended to return to the doctor in Morris for Hunter's delivery, but the doctor's office did not take Comer's insurance. Comer eventually went back to Vyas because his office accepted Comer's insurance.

¶ 8    Comer had been to Vyas's office several times during her 2013 pregnancy and a few times during her 2018 pregnancy with Hunter (hereinafter the current or instant pregnancy). Vyas's office was located in Ottawa but was not connected to, or part of, OSF Hospital. The first appointment that Comer had with Vyas at his Ottawa office for her current pregnancy was on or about June 25, 2018.[4] Comer also went to appointments at Vyas's Ottawa office on or about July 2, 2018, and July 14, 2018.[5]

¶ 9    On July 31, 2018, shortly after 12 p.m., Comer went to the emergency room at OSF Hospital because she was having what she thought were false labor pains.[6] Comer did not call Vyas prior to going to the emergency room because she thought the pains were false labor

---

[4]As indicated later in this opinion, other evidence showed that Comer had seen Vyas in OSF's emergency room on June 22, 2018, a few days before her first appointment.
[5]During Comer's testimony, a question was asked that referred to Comer being at Vyas's office on July 30, 2018. However, it cannot be determined from the record whether such an appointment actually occurred.
[6]Other records indicate that Comer went to the hospital at about 11 a.m.

4

contractions and did not want to bother Vyas. Comer was admitted to the hospital and was treated by Vyas. Hunter was delivered later that day after an emergency C-section was performed.

¶ 10    During her deposition, Comer was shown authorization and release forms she had signed for a hospital visit on June 22, 2018, and for her hospital admission on July 31, 2018 (the admission that resulted in Hunter's birth). Comer was also shown a consent for surgery form she had signed for the C-section at issue. Comer recognized those documents and acknowledged that she had signed and/or initialed those documents in various places.

¶ 11    Dr. Vyas testified in his deposition that he was a board-certified ob-gyn and that he had been in private practice since 1989. Vyas had privileges at OSF and some of the other hospitals in the area and performed approximately 200 to 250 deliveries at OSF per year. Vyas was not an employee of OSF, and the only direct payment that he received from OSF was for covering on-call obstetrics emergencies in the emergency room.

¶ 12    When Vyas saw prenatal patients, including Comer, he saw them at his private office in Ottawa. Vyas had a preexisting relationship with Comer—he had been Comer's doctor for several years and had delivered one of Comer's prior children. With regard to Comer's pregnancy with Hunter, the first interaction that Vyas had with Comer was on June 22, 2018, when Comer came to the labor and delivery department of OSF (presumably an emergency room visit) complaining of vaginal discharge. Comer was just under 31 weeks gestation at that point. After determining that both Comer and Hunter were doing well, Vyas discharged Comer from the hospital with instructions to follow up with him for her prenatal care. Comer did so and had a "handful" of appointments with Vyas between June 25, 2018, and July 30, 2018.

¶ 13    As indicated above, in addition to the deposition testimony, several pieces of documentary evidence were presented by the parties as supporting documents in the summary judgment

5

proceeding. Those documents included the authorization and release forms that Comer had signed during her June 22, 2018, hospital visit and her July 31, 2018, hospital admission; the consent for surgery form that Comer had signed prior to the instant C-section; the call coverage agreement between the hospital and Vyas; various answers to interrogatories; Vyas's application for reappointment of privileges; the ethical and religious directives for Catholic health care services (the hospital's ethical directives); the hospital procedure manual; the hospital's medical staff rules and regulations; excerpts of certain hospital policies and procedures that applied to ob-gyn matters; and various articles, internet postings, and advertisements that pertained to the hospital and/or Vyas. We will address each of those documents in turn.

¶ 14     The authorization and release form for each hospital visit/admission was a three-page printed document that contained eight numbered sections and addressed multiple topics, including the patient's authorization for medical treatment, consent for release of information for billing purposes, assignment of insurance benefits, agreement to pay for medical treatment, and liability for valuables. Of relevance to the issue raised in this appeal, the first page of the form contained the following provision:

> "*3. Independent Healthcare Practitioners*. I understand and acknowledge that most physicians, mid-level providers and allied health professionals ('healthcare practitioners') providing services at Hospital are *INDEPENDENT HEALTHCARE PRACTITIONERS who are not employees of Hospital*. These healthcare practitioners are independent contractors who are not employees or agents of Hospital, and Hospital is not responsible for their opinions, decisions or medical procedures performed. Independent physicians include, but are not limited to, consultants and specialists. I also understand that the healthcare practitioners

6

who provide the following services may not be employees or agents of Hospital: surgery, anesthesiology, pathology, radiology, orthopedic surgery, cardiology, hospitalist services, intensivist services, and emergency medicine. I understand that Hospital may be a teaching institution, providing clinical training opportunities for medical, nursing and allied health students and residents. I consent to such students and residents being involved in my care and treatment. *THE EMPLOYMENT OR AGENCY STATUS OF PHYSICIANS, MID-LEVEL PROVIDERS, AND ALLIED HEALTH PROFESSIONALS WHO TREAT ME WHILE AT HOSPITAL IS NOT RELEVANT TO MY SELECTION OF THIS OSF HOSPITAL FOR MY CARE.* I understand that professional personnel are available to explain this section to me."

(Emphases in original.)

Immediately under that paragraph on the form was a place for the patient to initial. Comer initialed the form for each visit/admission in that location. Further on in the form, prior to the patient's signature, the form indicated that the patient was acknowledging and certifying that all of the patient's questions had been answered to the patient's satisfaction. Comer signed and dated the form for each hospital visit/admission in that location in the space provided.

¶ 15     The consent to surgery form was a two-page printed document that had been presented to Comer during her July 31, 2018, hospital admission before her C-section had been performed. Along with other provisions, the form contained a numbered list of eight statements or representations related to surgery that the patient was acknowledging that he or she understood. More specifically, and of relevance to this appeal, the second page of the consent to surgery form contained the following statement in non-bolded print:

7

"8. I understand the doctors, anesthesiologists, nurse anesthetists, students, residents, paramedics, other trainees or other providers who take part in my procedure may be independent practitioners and not employees or agents of OSF Healthcare System or any of its affiliates, OSF Saint Elizabeth Medical Center, or OSF Saint Paul Medical Center."

The consent to surgery form also provided in bold text that the patient had read the form, understood the information, and had all of his or her questions answered. Comer signed the consent to surgery form in this particular case on July 31, 2018, at 12:55 p.m.

¶ 16   In the call coverage agreement, the hospital contracted with Vyas to have Vyas provide, on an independent contractor basis, on-call coverage of obstetrics and gynecology services to the hospital's emergency department and to inpatients and outpatients of the hospital. Of relevance to this appeal, the agreement required Vyas, when he was working on-call, to (1) respond by telephone within 15 minutes after being called or paged; (2) be physically present at the hospital, when requested, within 30 minutes after being called or paged (unless a longer time had been agreed to by the consulting physician); (3) comply with the hospital's charity care policies and accept all Medicaid and uninsured patients; (4) continue to care for all patients to whom Vyas had rendered on-call services until the patients were discharged from the hospital, regardless of the patients' ability to pay for those services; (5) provide follow-up care as needed after the patients' discharge for a specific disease or injury that had led to the consult until that disease or injury had resolved; (6) abide by the hospital's policies and procedures, bylaws, rules and regulations of medical staff, and ethical directives; and (7) establish from time to time and submit a schedule of his charges to the hospital for prior review and approval. The agreement also provided that Vyas would not get paid for on-call coverage if he failed to respond to a call within the time specified

and that the hospital could immediately terminate the agreement if Vyas provided services at the hospital that contravened the ethical directives.

¶ 17    As for Vyas's on-call status on the date at issue, one of the answers to interrogatories that was presented during the summary judgment proceeding indicated that Vyas was the on-call ob-gyn during Comer's July 31, 2018, hospital admission and subsequent C-section.

¶ 18    In his application for reappointment of privileges, Vyas specifically acknowledged that the exercise of his privileges was constrained by the hospital and medical staff polices and by the rules that applied in general and in the particular situation involved.

¶ 19    The hospital's ethical directives provided, in relevant part, that (1) the hospital would not honor an advance directive that was contrary to Catholic teaching; (2) a woman who had been raped could be given medications to prevent a pregnancy from occurring but only if conception had not already occurred (it was not permissible to initiate or recommend treatments that had as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum); (3) certain conception and artificial fertilization procedures were not allowed because they served as a substitute for the marital act, were contrary to the covenant of marriage, or involved the destruction or planned destruction of human embryos; (4) abortion was never permitted; (5) prenatal diagnosis was not permitted when it was undertaken with the intent of aborting an unborn child with a serious defect; (6) contraceptive practices were not to be promoted or condoned; and (7) direct sterilization of either a man or a woman, whether permanent or temporary, was not permitted.

¶ 20    OSF's hospital procedure manual provided, in pertinent part, that (1) practitioners granted privileges at the hospital were required to exercise those privileges in accordance with the ethical directives; (2) a physician who admitted a patient was required to ensure that a physical

9

examination and medical history had been done within 24 hours of admission; and (3) each staff member was required to abide by the hospital's bylaws, rules and regulations, policies, and procedures.

¶ 21    OSF's medical staff rules and regulations provided, in relevant part, that (1) all members of the medical staff were required to abide by the current ethical directives, bylaws, and certain other hospital and departmental rules and policies; (2) all patients had to be hospitalized under the care of a physician on the active or affiliate medical staff; (3) a physician who admitted a patient was required to conduct a complete history and physical examination of the patient and to make it available in the electronic record within 24 hours following admission and also prior to any surgery; (4) the physician (presumably the attending physician) was responsible for the history and physical of all patients that he or she admitted and for the care of medical problems; (5) the history and physical that the physician conducted were to include all pertinent findings resulting from an assessment of all systems of the body (a list of required pertinent findings was provided); (6) no patient was to be hospitalized without a provisional diagnosis; (7) progress notes were to be made by the treating physician every time he or she saw a patient; (8) physicians were required to make rounds at least every other day and to document their visit, even if the patient had been seen by a mid-level provider; (9) prior to any emergency surgery, a patient was to have preoperative labs at the discretion of the surgeon, the patient's primary physician, and/or the anesthesiologist; and (10) operative reports were required to be dictated or written immediately after surgery by the operating surgeon and should include findings, technical procedures used, estimated blood loss, specimens removed, and postoperative diagnosis. More specifically as to ob-gyn doctors and/or ob-gyn patients, the rules and regulations contained the following requirements: (1) progress notes were to be completed daily for obstetrical patients; (2) prior to admission, obstetrical patients were

10

required to have a "CBC, STS, and Rh/ABO"; (3) prior to any scheduled C-section, a patient was to have a "CBC and Type and Screen, PT/PTT/INR"; (4) direct sterilization of either a man or woman, whether permanent or temporary, was not permitted; (5) abortion was never permitted; (6) all inductions of labor were required to be medically indicated if the patient was less than 39 weeks gestation; (7) when the induction of labor was to be accomplished by the use of intravenous oxytocin drugs, the attending physician was required to be readily available during the entire time the oxytocin drug was in use and present in the hospital if a different rate or dosage, other than what was specified in the oxytocin protocol, was used; (8) fetal maturity had to be established and documented prior to any elective induction and C-section; and (9) the administration of Rh immune globulin was to be routine for all Rh negative mothers with Rh positive infants or following spontaneous abortions or ectopic pregnancy, unless the patient was sensitive to, or refused, such treatment.

¶ 22     The excerpts that were presented regarding the hospital's policies and procedures pertained to the hospital's tocolytic therapy policy (the use of medications to inhibit preterm uterine contractions), the hospital's prolonged labor policy (slow progression of labor or a failure of labor to progress), the hospital's external fetal monitoring policy, and the hospital's vacuum extraction policy (vacuum-assisted birth).[7] Of relevance to this appeal, the hospital's tocolytic therapy policy provided directions for when tocolytic drugs were to be administered and instructions on how to administer those drugs. The hospital's prolonged labor policy set forth how prolonged labor was diagnosed, when such a diagnosis should be made, and under what circumstances a C-section should be performed during prolonged labor. The hospital's external fetal monitoring policy

---

[7]Although the proper characterization of the excerpts is not quite clear from the record, plaintiffs represented in the trial court in their response to the motion for summary judgment that the excerpts were from the hospital's policies and procedures, and the hospital did not dispute that characterization in its later reply to plaintiffs' response or in its oral argument to the trial court.

11

provided detailed instructions on how external fetal monitoring was to be performed, how fetal monitoring strips were to be read, and when nurses should prepare for a possible prompt delivery. Similar to the other excerpts, the hospital's vacuum extraction policy specified the manner in which vacuum-assisted deliveries were to be performed.

¶ 23    Finally, with regard to the articles, Internet postings, and advertisements that were submitted, some of the articles/Internet postings were in the nature of the hospital congratulating Vyas for reaching a certain number of career deliveries. One such article/Internet posting indicated that Vyas had been delivering babies at "our hospital" since 1990. Another such article/Internet posting referred to Vyas as an "Ottawa doctor." A third article/internet posting stated that Vyas was "plan[ning] to continue his service at the hospital." In addition, one of the advertisements that was submitted was for the hospital's "[n]ew and [i]mproved" family birth center and listed Vyas's name under a column titled, "[o]ur OB [p]roviders."

¶ 24    In October 2021, the trial court held a hearing on the hospital's summary judgment motion. After listening to the parties' oral arguments, the trial court took the case under advisement. The trial court subsequently issued a written ruling finding that plaintiffs had failed to present sufficient evidence to establish that Vyas was the apparent or actual (implied) agent of the hospital and granting the hospital's motion for summary judgment on count IV of plaintiffs' third amended complaint on that basis. The trial court's ruling also contained an express written finding, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that the trial court's decision was a final order and that there was no just reason for delaying enforcement or appeal. Plaintiffs appealed.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, plaintiffs argue that the trial court erred in granting summary judgment for the hospital on count IV of plaintiffs' third amended complaint, which sought to hold the hospital

12

vicariously liable for the alleged negligence of Vyas. Plaintiffs assert that summary judgment should not have been granted for the hospital because the pleadings and supporting documents were sufficient to establish a genuine issue of material fact as to whether Vyas was the apparent or implied agent of the hospital. We will address each of plaintiffs' theories of agency in turn.

¶ 27                     A. Standard of Review and Legal

                    Principles That Apply to Summary Judgment

¶ 28        The purpose of summary judgment is not to try a question of fact but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions on file, and affidavits, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. See 735 ILCS 5/2-1005(c) (West 2018); *Adams*, 211 Ill. 2d at 43. Summary judgment should not be granted if the material facts are in dispute or if the material facts are not in dispute but reasonable persons might draw different inferences from the undisputed facts. *Adams*, 211 Ill. 2d at 43. A plaintiff is not required to prove his or her case at the summary judgment stage. *Churkey v. Rustia*, 329 Ill. App. 3d 239, 245 (2002). Rather, to survive a summary judgment motion, a plaintiff must present a factual basis that would arguably entitle the plaintiff to judgment in his or her favor. *Id.* Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt. *Adams*, 211 Ill. 2d at 43. In addition, while the question of whether an agency relationship exists is generally a question of fact, it may be decided by a court as a matter of law in a summary judgment proceeding when only one conclusion can be drawn from the undisputed facts. See *Churkey*, 329 Ill. App. 3d at 245. In appeals from summary judgment rulings,

13

the standard of review is *de novo*. *Adams*, 211 Ill. 2d at 43. When *de novo* review applies, the appellate court performs the same analysis that the trial court would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43. A trial court's grant of summary judgment may be affirmed on any basis supported by the record. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004).

¶ 29                                     B. Apparent Agency

¶ 30        As noted above, plaintiffs assert first that summary judgment should not have been granted for the hospital on count IV of plaintiffs' third amended complaint because a genuine issue of material fact existed on the question of apparent agency. More specifically, plaintiffs contend that the evidence presented in the summary judgment proceeding was sufficient to create a genuine issue of material fact as to whether Vyas was the apparent agent of the hospital since the evidence showed that (1) the hospital had held itself out as a provider of complete medical care in its emergency room without informing Comer that her attending physician (Vyas) was an independent contractor and (2) Comer relied upon the hospital to provide the physician who would treat Comer during her hospital stay. In making those contentions, plaintiffs maintain that the authorization and release and consent to surgery forms that Comer signed did not defeat plaintiffs' apparent agency theory because those forms were ambiguous in several respects. Plaintiffs also maintain that the fact that Comer had been a prior patient of Vyas was irrelevant and did not defeat plaintiffs' apparent agency theory because Comer did not select the physician who treated her at the hospital but, rather, relied upon the hospital to select the physician. For all the reasons set forth, therefore, plaintiffs ask that we reverse the trial court's ruling on plaintiffs' apparent agency theory, that we reverse the trial court's grant of summary judgment for the hospital on count IV of plaintiffs' third

14

amended complaint (presumably, the apparent agency portion of count IV), and that we remand this case for further proceedings.

¶ 31     The hospital argues that the trial court's ruling on plaintiffs' apparent agency theory was proper and should be upheld. In support of that argument, the hospital asserts that the evidence presented in the summary judgment proceeding failed to establish both that the hospital had held itself out as a provider of complete emergency room care and that Comer had relied upon the hospital to select the physician who would be treating her during her hospital stay. Thus, the hospital maintains that plaintiffs failed to establish that a genuine issue of material fact existed on plaintiffs' theory of apparent agency. The hospital asks, therefore, that we affirm the trial court's ruling on plaintiffs' apparent agency theory and that we affirm the trial court's grant of summary judgment for the hospital on count IV of plaintiffs' third amended complaint.

¶ 32     Pursuant to the doctrine of apparent authority, also known as the doctrine of apparent agency, a hospital may be found vicariously liable for the negligent acts of a physician providing treatment at the hospital, regardless of whether the physician was an independent contractor when the negligence occurred. See *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 32 (1999); *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶ 22. For the doctrine of apparent authority to apply, the plaintiff patient must plead and prove the following three elements: (1) that the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in those acts; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence. *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 25. To survive a defendant

15

hospital's motion for summary judgment as to an apparent authority theory, a plaintiff must present at least some evidence to satisfy each of the above three elements. *Id.*

¶ 33    The first two elements of apparent authority are often grouped together and referred to as the holding out element, while the third element is often referred to as the justifiable reliance or the reliance element. See *id.* ¶¶ 26, 32. With the holding out element, the focus is on what the plaintiff knew or should have known. See *id.* ¶ 26. If the plaintiff knew or should have known that the physician was an independent contractor, the plaintiff is unable to satisfy the holding out element, and the hospital cannot be held vicariously liable for the physician's negligence. *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶ 39. The holding out element does not require an express representation by the hospital that the person alleged to be negligent is an employee or agent. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993). Rather, the holding out element is satisfied when the hospital holds itself out as the provider of emergency room care without informing the patient that the care is given by independent contractors. *Id.* However, if the patient is in some manner put on notice of the independent contractor status of the physician at issue, the holding out element cannot be met and vicarious liability under the apparent authority doctrine will not apply. See *Mizyed*, 2016 IL App (1st) 142790, ¶ 39.

¶ 34    In determining whether the holding out element has been satisfied, one of the factors that a court will consider is whether the patient signed a hospital consent to treatment form that contained independent contractor disclaimer language that was clear, unambiguous, and conspicuous. See *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 27. That factor is important because it is unlikely that a patient who signed such a form could reasonably believe that her treating physician was an employee or agent of the hospital when the form contained specific language to the contrary. *Id.* However, although the presence of disclaimer language in a signed

16

consent form is an important factor, it is not always dispositive as to the holding out element. *Id.* Rather, the circumstances in a particular case may be such that, even though the plaintiff signed a consent form containing independent contractor disclaimer language, additional facts exist that create a genuine issue of material fact as to whether the hospital held the physician out as its agent. *Hammer*, 2016 IL App (1st) 143066, ¶ 23.

¶ 35    With regard to the justifiable reliance element, the focus is on whether the plaintiff sought care from the hospital itself or from a specific physician. *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 32. As our supreme court noted in *Gilbert*:

> " '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.' " *Gilbert*, 156 Ill. 2d at 525-26 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 857 (Wis. 1988)).

Thus, the justifiable reliance element is satisfied if the patient or those responsible for his or her care relied upon the hospital to provide complete emergency room care, rather than relying upon a specific physician. *Fese v. Presence Central and Suburban Hospitals Network*, 2023 IL App (2d) 220273, ¶ 84.

17

¶ 36        In the present case, after reviewing the pleadings and supporting documents presented in the summary judgment proceeding in the light most favorable to plaintiffs (as the nonmoving party), we find that plaintiffs failed to present sufficient evidence to establish a genuine issue of material fact as to whether Vyas was the apparent agent of the hospital. We reach that conclusion based primarily upon the prior history between Vyas and Comer, rather than based upon the authorization and release and consent to surgery forms that Comer signed and/or initialed. At best, the authorization and release and consent to surgery forms in this particular case informed Comer that "most" of the physicians who provided services at the hospital were independent contractors and that Vyas "may be" an independent contractor. Thus, unlike the consent forms in the *Delegatto* case, the main case relied upon by the hospital on this issue, the authorization and release and consent to surgery forms that were used in this particular case were not clear and unambiguous. *Cf. Delegatto v. Advocate Health & Hospitals*, 2021 IL App (1st) 200484, ¶¶ 9, 11, 47 (finding that the hospital consent forms in that case, which stated that the patient understood that " 'all' " physicians furnishing services to her were " 'independent contractors' " and were not " 'employees or agents of the hospital,' " were clear and unambiguous (emphasis omitted)). That being noted, the other evidence that was presented in this case established that Comer was well aware of, or at least, should have been well aware of, Vyas's status as an independent contractor. The other evidence that was submitted showed that Comer had been Vyas's patient during the entire course of her 2013 pregnancy and the latter part of her current pregnancy. During both periods, Comer had been to several appointments at Vyas's private office, which was not part of the hospital. Comer was thus put on notice of Vyas's independent contractor status. Therefore, despite the articles, Internet postings, and/or advertisements made by the hospital in this case, plaintiffs could

18

not satisfy the holding out element of their apparent agency theory. See *Mizyed*, 2016 IL App (1st) 142790, ¶ 39; *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 32.

¶ 37    Having so concluded, we need not determine whether plaintiffs were able to establish the justifiable reliance element of their apparent agency theory. See *Gore v. Provena Hospital*, 2015 IL App (3d) 130446, ¶ 34 (noting that the appellate court's conclusion that the plaintiff had failed to establish the holding out element of her apparent agency theory rendered an analysis of the justifiable reliance element unnecessary). The trial court properly found that plaintiffs had failed to present sufficient evidence to establish a genuine issue of material fact as to whether Vyas was the apparent agent of the hospital and correctly granted summary judgment for the hospital on the portion of count IV of plaintiffs' third amended complaint that was based on an apparent agency theory.

¶ 38                                    C. Implied Agency

¶ 39    Plaintiffs assert second in this appeal that summary judgment also should not have been granted for the hospital on count IV of plaintiffs' third amended complaint because a genuine issue of material fact existed on the question of implied agency as well. More specifically, plaintiffs contend that the evidence presented in the summary judgment proceeding of the hospital's control over Vyas's practice of medicine, as indicated by such things as the call coverage agreement, the ethical directives, and the hospital procedure manual, was sufficient to give rise to a genuine issue of material fact as to whether Vyas was the implied agent of the hospital. According to plaintiffs, the trial court reached the wrong conclusion on implied agency because it incorrectly focused on Vyas's contract with the hospital (the call coverage agreement) and on what Vyas and the hospital had intended with regard to Vyas's employment status and because the trial court incorrectly characterized the hospital's restrictions and directives (plaintiffs' evidence of control) as being

19

merely administrative or quality care guidelines, even though those restrictions and directives went right to the heart of Vyas's medical practice as an ob-gyn. For all of the reasons stated, therefore, plaintiffs ask that we reverse the trial court's ruling on plaintiffs' implied agency theory, that we reverse the trial court's grant of summary judgment for the hospital on count IV of plaintiffs' third amended complaint (presumably, the implied agency portion of count IV), and that we remand this case for further proceedings.

¶ 40      The hospital argues that the trial court's ruling on plaintiffs' implied agency theory was proper and should be upheld. In support of that argument, the hospital asserts that the evidence presented in the summary judgment proceeding failed to establish that the hospital controlled or maintained the right to control Vyas's medical judgment as necessary for an implied agency relationship to be found. Rather, the hospital maintains that the hospital documents plaintiffs cited were nothing more than administrative policies and procedures that did not contain language instructing or restricting Vyas's medical decision-making ability. Based upon the hospital's alleged lack of control over Vyas, the hospital asks that we affirm the trial court's ruling on plaintiffs' implied agency theory and that we affirm the trial court's grant of summary judgment for the hospital on count IV of plaintiffs' third amended complaint.

¶ 41      One of the ways that a hospital may be held vicariously liable for an independent contractor physician's alleged negligence is through the doctrine of implied authority, also known as the doctrine of implied agency. See *Petrovich*, 188 Ill. 2d at 31. Implied authority is actual authority that is proven through circumstantial evidence. *Id.* at 42. "The primary consideration in determining the existence of implied authority is not the intent of the parties, or whether the physician is an employee or independent contractor, but rather the degree of control the principal retains over performance of the contractor's work." *Hammer*, 2016 IL App (1st) 143066, ¶ 16.

20

Whether control was actually exercised is not dispositive as to this issue. *Id.* Instead, whether the principal has the right to control the alleged agent is the proper inquiry, even where that right is not exercised. *Id.*

¶ 42 In a hospital-physician relationship, such as the one in the present case, "the key issue is whether the hospital has the right to control the physician's exercise of medical judgment in delivering medical care to patients." *Id.* If the hospital retains sufficient control over the physician's work, the physician's independent contractor status is negated (at least with respect to third parties), an implied agency relationship exists, and the hospital may be held vicariously liable for the physician's negligence. See *Petrovich*, 188 Ill. 2d at 46; *Hammer*, 2016 IL App (1st) 143066, ¶ 16. No precise formula exists for determining whether a person's status as an independent contractor has been negated. *Petrovich*, 188 Ill. 2d at 46. Rather, the determination of whether a person is an agent or an independent contractor depends upon the unique facts and circumstances of each particular case. *Id.*

¶ 43 In the present case, after reviewing the pleadings and supporting documents in the light most favorable to plaintiffs, we find that the evidence presented in the summary judgment proceeding was sufficient to create a genuine issue of material fact as to whether Vyas was the implied agent of the hospital. See *Churkey*, 329 Ill. App. 3d at 245. The pleadings and supporting documents showed that the hospital maintained the right to control several aspects of Vyas's practice as an ob-gyn. Most notably, the supporting documents established that Vyas could not perform certain conception and artificial fertilization procedures, sterilization procedures, or abortions. These procedures are medical healthcare procedures and/or medications and involve healthcare decisions. Also, the manner in which Vyas was to administer tocolytic therapy and to conduct vacuum-assisted birth, external fetal monitoring, and the induction of labor were dictated

21

in detail by the hospital. Some of the hospital's detailed directions applied specifically to the timing of performing a C-section, the very procedure involved in the instant case. As to obstetrical patients, Vyas had to complete progress notes on a daily basis and had to have certain testing and procedures completed prior to any admission and prior to any scheduled C-section. Many of the hospital's directives, policies, procedures, and rules (collectively referred to as rules) were, as the trial court correctly found, more of an administrative nature. However, the above-listed rules went to key aspects of Vyas's practice of medicine as an ob-gyn and pertained directly to Vyas's medical decision-making ability. In addition, some of the administrative rules also contained provisions that required Vyas to take, keep, or maintain certain patients until after their immediate conditions had been resolved. We also note that the call coverage agreement in this case allowed the hospital to immediately discharge Vyas from on-call work (terminate the call coverage agreement) if Vyas provided services at the hospital that contravened the ethical directives. "The presence of contractual provisions subjecting the person to control over the manner of doing the work is a traditional indicia that a person's status as an independent contractor should be negated." *Petrovich*, 188 Ill. 2d at 46-47.

¶ 44       Based upon the unique facts of this case and the specific rules that the hospital had put in place that directly pertained to Vyas's medical decision-making ability as an ob-gyn, we are unable to find as a matter of law that Vyas was not the implied agent of the hospital. In *Petrovich*, one of the main cases relied upon by plaintiffs here, the Illinois Supreme Court was presented with the question of whether a health maintenance organization (HMO) could be held vicariously liable under agency law for the alleged negligence of its in-network, independent-contractor physicians. *Id.* at 22. The supreme court answered that question in the affirmative and found that under the facts of that particular case, the plaintiff had presented sufficient evidence to entitle her to a trial

22

on whether the HMO was vicariously liable under the doctrines of apparent and implied authority. *Id.* In reaching that conclusion, the supreme court noted, in part, that the plaintiff had presented adequate evidence in that case to show that the HMO had maintained sufficient control over its in-network, independent-contractor physicians to create a genuine issue of material fact on the question of implied agency and to survive the HMO's motion for summary judgment. *Id.* at 50-52. More specifically, the supreme court pointed out, the pleadings and supporting documents in that case established that the HMO's method of compensating in-network physicians provided financial disincentives for physicians to order expensive tests and/or treatments, the HMO's quality assurance program allowed the HMO to terminate in-network physicians from the network for providing what the HMO deemed to be " 'inappropriate' care," and the HMO's gatekeeping/referral requirements prevented a patient from seeing a specialist without a referral from the patient's primary care physician and would not allow a specialist to order procedures or tests. *Id.* at 48-52. Contrary to OSF's assertion on appeal, this is not a case, such as *Magnini v. Centegra Health System*, 2015 IL App (1st) 133451, ¶ 32, or *Hammer*, 2016 IL App (1st) 143066, ¶ 16, where the hospital rules at issue were purely administrative and collateral to the physician's patient care decisions.

¶ 45        The determination of whether Vyas was the implied agent of the hospital is a question of fact for the trier of fact to decide in this particular case. See *Petrovich*, 188 Ill. 2d at 50-52. We conclude, therefore, that the trial court erred in granting summary judgment for the hospital on the portion of count IV of plaintiffs' third amended complaint that sought to hold the hospital vicariously liable for the alleged negligence of Vyas on an implied agency theory. See *id.*

¶ 46                                    III. CONCLUSION

¶ 47          For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County

in part, reverse in part, and remand this case for further proceedings.

¶ 48          Affirmed in part and reversed in part; cause remanded.

¶ 49          JUSTICE BRENNAN, specially concurring:

¶ 50          I agree that the trial court erred in granting summary judgment because a factual question

exists as to implied authority; I write separately, however, to emphasize my disagreement with

certain aspects of the majority's implied authority analysis. The majority identifies three aspects

of control to support its conclusion that there is a genuine issue of material fact as to implied

authority: certain of the hospital's obstetric care requirements, certain administrative rules, and

the Catholic Conference of Bishop's ethical directives adopted by the hospital. While I agree

that, under the record as developed, certain of the hospital's obstetric care requirements raise a

question as to implied authority, I respectfully disagree that the administrative rules or the ethical

directives do so.

¶ 51          Concerning the administrative rules, the majority specifically identifies rules requiring

daily progress notes and the continued outpatient care of patients upon release from the hospital

until their conditions resolve. These requirements, however, do not evidence a right to control,

negating independent agency, because they in no way purport to direct the actions taken by the

doctor in treating patients. See *Magnini v. Centegra Health System*, 2015 IL App (1st) 133451,

¶ 32 (no right to control where policies concern matters collateral to patient care and do not

purport to direct actions of physicians as to medical decisions). Requiring that physicians prepare

progress notes documenting their treatment in no way directs how doctors care for the patients.

Likewise, requiring that physicians continue caring for patients upon their release from hospital

does not otherwise direct how the physician's care for the patients. These are purely administrative rules that govern the physician's relationship with the hospital, but in no way interfere with the physician's independent medical judgment in treating patients.

¶ 52        Concerning the ethical directives, the majority conflates the hospital's decision not to offer certain procedures on religious grounds with the right to control a physician's independent medical judgment. Simply put, the ethical directives limit the menu of options offered by the hospital. The medical judgment of physicians as to these disallowed options is not implicated because the hospital does not offer these procedures in the first place. That the proscribed procedures might otherwise fall within the medical standard of care is a red herring. They are not offered by the hospital and thus treating physicians exercise no medical judgment as it relates to these procedures.

¶ 53        JUSTICE McDADE, concurring in part and dissenting in part:

¶ 54        The trial court granted summary judgment in favor of defendant hospital, finding plaintiffs had failed to demonstrate the existence of triable issues regarding either apparent or implied agency and the hospital was entitled to judgment as a matter of law. In this court, the majority affirms the decision that plaintiffs failed to make an adequate showing of apparent agency, but reverses on implied agency, finding plaintiffs' showing was sufficient to proceed with the litigation. I agree with the reversal on implied agency and, therefore, concur in that decision.

¶ 55        However, I write separately because I believe it was also error for the trial court to grant summary for the hospital on the issue of apparent agency. I do not quarrel with the majority's recitation of the facts or the law but rather with the application of one to the other.

¶ 56                                    I. Holding Out

¶ 57        In general terms, "apparent agency" exists where one party (principal) places another in a

position in which that second party (agent) *appears* to have certain rights and responsibilities,

which it does not have. Under the theory, a third party can bind the principal to that appearance

unless the principal effectively disclaims the agency, barring the third party's continued reliance.

The Illinois Supreme Court set out the theory's applicability in medical malpractice in its

seminal decision in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993). See *supra*

¶¶ 33, 35. The court said:

> "We stress that liability attaches to the hospital only where the treating physician is
>
> the apparent or ostensible agent of the hospital. *If a patient knows, or should have*
>
> *known*, that the treating physician is an independent contractor, then the hospital will
>
> not be liable. See [*Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 855 n.7
>
> (Wis. 1988)]." (Emphasis added.) Gilbert, 156 Ill. 2d at 522-23.

It seems plain that the answer to the question "apparent to whom?" can only be "the plaintiff"

and that the foreclosure of reliance results when the plaintiff *understands* that the apparent

agency is actually illusory.

¶ 58        If the hospital is going to escape the accountability for proper treatment that most people

seeking its services would routinely expect, it must make its separation from the acts of the

service provider clear and unambiguous. With that understanding, the mere parroting of the term

"independent contractor," without significantly more clarity about its meaning, would seem to be

insufficient to disclaim the agency and defeat the appearance. I would find that the hospital had

adequately disclaimed the agency of Dr. Harshavadan Vyas and that his lack of agency was

made apparent to plaintiff such that there was no "holding out" *only* if Kayla Comer knew the

26

significance of the phrase "independent contractor" and if she had not gone to the hospital emergency room in medical distress and in search of immediate care OR if the words in the pertinent forms she had signed on her visits had fully communicated to Comer what the hospital wants us to find that they *meant.* Because neither of those situations exists in this case, I would find that the hospital has not successfully rebutted plaintiffs' claim of "holding out" and that there are remaining factual disputes, leaving apparent agency a viable issue for litigation.

¶ 59    The relevant portions of the authorization/release and surgical consent forms are described above. See *supra* ¶¶14-15. Nowhere in paragraph three of the authorization and release form does the hospital explain the practical or legal significance of its statements to the patient. It seems evident that if there is something you want understood by someone, you present it in straight-forward terms and using methods that the person with whom you are communicating can understand in the circumstances. That did not happen here.

¶ 60    Paragraph three says "most" of the people providing you medical service here are "independent contractors" and are not our employees; we are not "responsible" for their opinions, decisions, or the medical procedures they perform. Nowhere does it refer to mistakes the practitioners might make or injury/death they might cause OR disclaim any possible legal liability of the hospital in the event of such mistake or harm. This authorization/release provides lawyers a basis to argue legal theory with other practitioners and the courts, but it is not relevantly informative for a large portion of people seeking emergency medical care.

¶ 61    When this lack of specificity and of plain language in the document is coupled with the probability that the patient is currently in medical distress, it is unlikely that the patient will carefully examine a three-page document (or a two-page surgical consent) or understand the nuances of unstated suggestions unless its significance is explained to her. She will just act in

27

compliance with "initial here" and "sign there," often not on the document itself but on a little machine showing only a line for electronic initials or signature. In some instances, the patient never even sees the form, just the signature lines on the electronic pad, and does not have an opportunity to actually read the document that effectively surrenders critical rights.

¶ 62      But the majority also questions, although not for all of my reasons, the effectiveness of the documents to disclaim the apparent agency of Vyas. Instead, it finds that Comer's doctor-patient relationship with him is dispositive of the issue, concluding that because she knew he was an "independent contractor," she necessarily also knew that he was not the hospital's agent and could not render it liable for her son's injury and death. Again, the document does not tell her what an "independent contractor" is but *does* suggest that one cannot have that status and also be an employee. It does not explain the significance of the difference, simply assuming that she is aware of it. Nor does the document's language effectively identify Vyas as an independent contractor. The hospital indicates that those who provide a list of specified services "*may not be*" its employees. "Obstetrics/gynecology" service does not appear on that list, and one possible and rational conclusion a patient might draw is that people providing that service were employed to do so on a full- or part-time basis. Although "surgery" *is* on the list, at the time she arrived and signed the authorization/release form, she would have had no reason to suspect she would be a candidate for that service and no reason to focus on the employment status of surgeons. The relevant portion of the surgical consent form suffers from the same communication flaws, plus Comer's condition had changed significantly, and it is not clear that she understood from the form that she was acknowledging Vyas was an "independent contractor" such that the hospital was absolved of all responsibility for any harm that he caused.

¶ 63                                    II. Justifiable Reliance

¶ 64          The majority chooses to rest its decision on the fact that she had been seen by Vyas in the offices of his own private practice multiple times. Again, neither form Comer signed said what an independent contractor is or the significance of the difference in employment status. In addition, there is no evidence that she knew Vyas would be there at that time or arranged to meet him at the hospital or went there seeking out *his* service. Indeed, if the hospital is to rely on its own form, she acknowledged that she was seeking service from the hospital and not from a specific doctor. The following language from *Gilbert* quoted by the majority seems particularly significant here:

> " '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.' " (Internal quotation marks omitted.) *Supra* ¶ 35 (quoting *Gilbert*, 156 Ill. 2d at 525-26).

¶ 65          Viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor, as we are required to do in this review, it is clear that Comer went to the hospital *instead* of going to Vyas's office because she suspected she might be having false labor

29

and she did not want to bother him. Thus, the evidence is that she went expecting the hospital, not Vyas, to provide the care she needed. She has, therefore, met the threshold for justifiable reliance.

¶ 66    I would find that there are enough material facts remaining in dispute on the question of apparent agency to leave triable issues to be resolved by the trier of fact and I, contrary to the majority, would reverse the trial court on both apparent agency and implied agency.

*First Midwest Bank v. Ottawa Regional Hospital & Healthcare Center*,
2023 IL App (3d) 220008

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 19-L-128; the Hon. Troy D. Holland, Judge, presiding. |
| **Attorneys for Appellant:** | Michael W. Rathsack, of Park Ridge, for appellants. |
| **Attorneys for Appellee:** | Daniel P. Slayden, Charles A. Egner, and Steven P. Slayden, of Lewis Brisbois Bisgaard & Smith LLP, of Chicago, for appellee. |