2016 IL App (1st) 143066

FIRST DIVISION
January 25, 2016

No. 1-14-3066

| | | |
|---|---|---|
| NATALIE HAMMER, Individually and as Administrator of the Estate of Jerry Michael Hammer, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2010 L 13668 |
| | ) | |
| MARY JANE BARTH, M.D.; CARDIOVASCULAR SURGEONS, LTD., a Corporation; and ADVOCATE CHRIST HOSPITAL, | ) ) ) ) | Honorable |
| | ) | Kathy M. Flanagan, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Liu and Justice Cunningham concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Natalie Hammer, individually and as administrator of her husband Jerry Michael Hammer's estate, appeals the order of the circuit court granting summary judgment in favor of defendant Advocate Christ Hospital (Advocate) on plaintiff's wrongful death complaint. Plaintiff alleged that Advocate was vicariously liable for Dr. Barth's negligence based on theories of agency.   On appeal, plaintiff contends the trial court erred in granting summary judgment because a genuine issue of material fact exists whether defendant Dr. Barth acted as an agent of Advocate.   For the following reasons, we affirm the trial court's summary judgment on the issue of actual agency and reverse and remand for a jury trial on Advocate's liability under the doctrine of apparent authority.

¶ 2          JURISDICTION

¶ 3 The trial court entered its order granting summary judgment on September 15, 2014. Respondent filed her notice of appeal on October 3, 2014. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. May 30, 2008) governing appeals from final judgments entered below.

¶ 4          BACKGROUND

¶ 5 The following are facts relevant to the issues on appeal. Plaintiff testified in her deposition that in late 2006 or early 2007, her husband's long-time physician recommended that he see Dr. Javois for a catheterization procedure. At the time, she had not heard of Advocate. She and her husband met with Dr. Javois in an office building near the hospital, but not on hospital grounds. On March 21, 2007, in connection with the catheterization procedure, plaintiff's husband signed a health care consent form bearing Advocate's logo. The consent form contains the following:

> "INDEPENDENT PHYSICIAN SERVICES. I acknowledge and fully understand that some or all of the physicians who provide medical services to me at the hospital are not employees or agents of the hospital, but rather independent practitioners on the hospital medical staff who are permitted to use the hospital facilities to render medical care and treatment. Non-employed physicians may include, but are not limited to, those practicing emergency medicine, trauma, cardiology, obstetrics, surgery, radiology, anesthesia, pathology and other specialties. My decision to seek medical care at the hospital is not based upon any understanding, representation, advertisement, media campaign, inference, implication or reliance that the physicians who are or will be treating me are employees or agents of the hospital."

The form also states that "the hospital bill does not include most physician services" and the patient understands that he "will receive separate physician bills."

¶ 6     When plaintiff's husband needed another procedure, Dr. Javois referred him to Dr. Ilbawi.   He met with Dr. Ilbawi for the first time at the doctor's office in the basement of Hope Children's Hospital, which was adjacent to Advocate.   Dr. Ilbawi was employed by Cardiovascular Surgeons, Ltd. (CSL), which entered into a professional service agreement with Advocate.   The agreement provided, in relevant part, that "[t]he services of [CSL] and its physicians, employees, and contractors are those of an independent contractor practicing the profession of medicine and specializing in pediatric cardiac surgery."

¶ 7     In connection with the procedure, plaintiff's husband signed a health care consent form identical to the one he signed in March.   Dr. Ilbawi, assisted by Dr. Barth who was also employed by CSL, performed the procedure on July 30, 2007, after which plaintiff's husband was transferred from the pediatric surgical heart unit to a floor in the general hospital.   On August 7, 2007, he experienced shortness of breath and was brought back to the pediatric surgical heart unit.   At that time, Dr. Barth placed right and left sided chest tubes.   Plaintiff had not spoken with Dr. Barth before this procedure.

¶ 8     On September 6, 2007, plaintiff's husband needed another chest tube placement for treatment of a left side pleural effusion.   Consent for the procedure was obtained by telephone, and plaintiff testified that she was in the parking lot of Advocate when she received the call. The form indicating the consent made no reference to the agency of the physicians and had Advocate's name and logo on it.   On the form, someone wrote that plaintiff gives her consent with the condition that an adult pulmonologist see her husband.   Plaintiff stated that she asked for the condition because her husband "was in the children's hospital and they were all

pediatricians and pediatric doctors and he was *** having trouble with pulmonary issues." When asked if she knew of a specific adult pulmonologist at Advocate she wanted her husband to see, plaintiff answered, "No."

¶ 9    Several hours after the procedure, bleeding was found in his abdomen and a splenectomy was performed.    Plaintiff's husband remained hospitalized for eight more months.    He died of a cardiac arrhythmia on August 27, 2010.    Plaintiff filed a complaint seeking damages for medical negligence.    In her third-amended complaint, plaintiff contended that Dr. Barth was an agent of Advocate thus rendering Advocate vicariously liable for her negligence.    She alleged that her husband did not choose Dr. Barth to provide surgical services and that he relied on Advocate to provide complete surgical care.

¶ 10    Plaintiff never discussed whether the physicians caring for her husband were employed by Advocate.    However, it was her understanding that Dr. Ilbawi and Dr. Barth "worked in the same group" and were "part of the hospital."    Plaintiff did not recall whether Dr. Barth or Dr. Ilbawi ever wore lab coats with the Advocate symbol on them, or had identification badges with the Advocate symbol.    In her answer to plaintiff's interrogatories, Dr. Barth stated that at all relevant times she was an employee of CSL.    She also stated that Advocate provided her with a lab coat but she did not know if she was wearing it when she treated plaintiff's husband.    Dr. Barth had other lab coats that did not feature Advocate's logo.    While working at Advocate, Dr. Barth always wore a name tag which identified her as an Advocate employee so she could have access to the hospital unit.    She stated that "[t]here is no question I would have worn my I.D. when caring for [plaintiff's husband]."    Dr. Barth also served, unpaid, as cochairman of the quality assurance committee at Advocate from 2006 to 2009.    Dr. Ilbawi testified that the professional service agreement related to administrative duties pertaining to pediatric cardiac

surgery, and not to the provision of private fee-for-service patient care. Dr. Ilbawi was the director of pediatric cardiac surgery at Advocate and Hope Children's Hospital, but the position did not involve clinical activities. A printout of charges for physician services sent to plaintiff's husband showed that CSL prepared the billing.

¶ 11 Advocate's website advertises itself as a medical center which "has earned clinical leadership in more than 60 fields of medicine. Our team of 1,000+ doctors includes specialists in cardiology, neurosciences, oncology, orthopedics, pediatrics, surgical services, women's health, and emergency medicine. Our Level I trauma center stands among the most experienced emergency centers in Illinois." As a medical staff member, Dr. Barth was required to provide cardiac surgical services to patients of the medical center, even if they were not her patients. She was also required to accept committee assignments from Advocate and to participate in the emergency department's on-call list. Dr. Barth was subject to periodic reappraisals by Advocate and under its bylaws, Advocate could revoke Dr. Barth's clinical privileges or terminate her appointment for cause.

¶ 12 Advocate filed a motion for summary judgment, which the trial court granted.[1] The trial court found no evidence that Dr. Barth was an employee of Advocate, since the agreement states that physicians associated with CSL are independent, and any services provided through the professional service agreement are administrative in nature. The trial court also found that no implied agency existed because Dr. Barth retained the right to control her work as a physician and to guide the treatment and care of her patients, regardless of the procedures and bylaws applicable to the medical staff. Finally, the trial court determined that no apparent agency

---

[1] The cause remains pending against the other defendants.

existed because the consent form signed by plaintiff's husband contained a clear disclaimer regarding Dr. Barth's hospital employee status. Plaintiff filed this timely appeal.

¶ 13                                    ANALYSIS

¶ 14    Plaintiff contends that the trial court erred in granting summary judgment in favor of Advocate. Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). In reviewing a motion for summary judgment, we construe the record in the light most favorable to the nonmoving party and strictly against the moving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Although plaintiff need not prove her entire case at the summary judgment stage, she must present facts showing she is entitled to judgment. *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1086 (2009). We review the trial court's ruling on a summary judgment motion *de novo*. *Williams*, 228 Ill. 2d at 417.

¶ 15    In her amended complaint, plaintiff alleges that Advocate is liable for the negligence of Dr. Barth based on an agency theory. If a principal-agent relationship exists between the hospital and physician accused of malpractice, the hospital may be vicariously liable for the physician's alleged negligence. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). To prevail on a claim of actual agency, plaintiff must show that (1) a principal-agent relationship existed between the hospital and physician; (2) the hospital controlled or had the right to control the conduct of the physician; and (3) the alleged conduct fell within the scope of the agency. *Wilson v. Edward Hospital*, 2012 IL 112898, ¶ 18. Traditionally, the relationship between a hospital and the physicians on its staff who are not employees is an independent one. *Hundt v. Proctor Community Hospital*, 5 Ill. App. 3d 987, 990 (1972). A principal is not

generally liable for the acts of an independent contractor. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999).

¶ 16    However, if the principal retains sufficient control over the independent contractor's work, his independent status is negated and the principal is vicariously liable for the contractor's tortious conduct. *Id*. at 42. This type of authority, termed implied authority, is actual authority proved by circumstantial evidence. *Id*. The primary consideration in determining the existence of implied authority is not the intent of the parties, or whether the physician is an employee or independent contractor, but rather the degree of control the principal retains over performance of the contractor's work. *Id*. In a hospital-physician relationship, the key issue is whether the hospital has the right to control the physician's exercise of medical judgment in delivering medical care to patients. *Id*. at 45-46.

¶ 17    In the case at bar, Dr. Barth's employer, CSL, executed a professional service agreement with Advocate which states that "[t]he services of [CSL] and its physicians, employees, and contractors are those of an independent contractor practicing the profession of medicine and specializing in pediatric cardiac surgery." Plaintiff contends, however, that Advocate retained control over the physicians' work through the service agreement and its bylaws, and whether this circumstantial evidence shows an agency relationship between the parties is a question of fact. As support, she cites to *Barbour v. South Chicago Community Hospital*, 156 Ill. App. 3d 324 (1987).

¶ 18    In *Barbour*, the defendant hospital argued that one of the physicians alleged to have injured plaintiff was not a paid employee of the hospital, and therefore no agency relationship existed. *Id*. at 327. The plaintiff alleged, however, that one of the physicians responsible for her injury was appointed department chief by defendant hospital's board of directors and that as

department chief he monitored, controlled, and assisted in patient care and quality within the department. *Id*. at 327-28. The complaint also alleged that the hospital could remove the physician from his position as department chief "if he failed to perform his duties properly" and "that any decision by the board to change policy or practice in the [department] would have to be implemented by the board through [the physician]." *Id*. at 329. According to the complaint, the physician was "not an independent contractor but was rather the board's representative within the [department]" and "acting within the purview, and under the authority, of" the hospital's Board. *Id*. This court concluded that the facts sufficiently alleged the existence of a dispute as to the extent of the parties' relationship, and therefore "the existence and scope of an agency relationship are questions of fact for the jury to decide." *Id*.

¶ 19 Likewise in *Petrovich*, the plaintiff alleged that the defendant HMO's capitation method of compensation punished physicians for ordering certain medical treatments, its quality assurance review monitored patient care to discourage physicians from giving " 'inappropriate' " medical care, and its physicians served as "gatekeepers" to control which patients were accepted for care by following criteria on the defendant's referral forms, all of which indicate control over the physician's work. The supreme court agreed, finding that the plaintiff presented adequate evidence to survive the defendant's motion for summary judgment. *Petrovich*, 188 Ill. 2d at 49-51.

¶ 20 Plaintiff here argues that the service agreement and bylaws enable Advocate to control Dr. Barth's work sufficiently to establish a principal-agent relationship. She contends that Advocate had the right to terminate the service agreement with CSL for reasons including poor clinical patient care or case management and retained the right to revoke clinical privileges or terminate Dr. Barth's appointment for cause. She further contends that Advocate reviewed Dr. Barth's

participation in medical staff meetings, clinical work, and her adherence to bylaws, rules, regulations and policies, retained exclusive control over all patient medical records, and required Dr. Barth to provide an operative report for certain procedures. Advocate also required Dr. Barth to participate in committees, treat all patients admitted to Advocate, consult with other physicians, and participate in its emergency on-call list.

¶ 21 Plaintiff's case is factually distinguishable from *Barbour* and *Petrovich*. Unlike the physician in *Barbour*, Dr. Barth is not the department chief. As the trial court below noted, Advocate's recertification and reappointment process for staff privileges do not indicate sufficient control over Dr. Barth's medical judgment in the treatment of her patients to negate her independent status, and at most show only control over the conduct and activities of its medical staff. Furthermore, its procedures and regulations required of medical staff are mostly administrative. Compliance with such review and regulation procedures in itself does not indicate control by Advocate over its physicians. *Id*. at 48-49. Unlike the plaintiffs in *Barbour* and *Petrovich*, both of whom alleged facts showing control over the physician's medical judgment in specific circumstances, plaintiff here generally argues that the substance of Advocate's bylaws and other requirements show a sufficient right of control, and that the bylaws and service agreement "go far beyond giving Dr. Barth the right to use the facilities to treat her own patients." Plaintiff does not provide specific facts supporting these general allegations. Although she need not prove her entire case at the summary judgment stage, plaintiff must allege facts showing she is entitled to judgment. *Wallace*, 389 Ill. App. 3d at 1086. Therefore, the trial court properly granted summary judgment on the issue of actual agency.

¶ 22 Plaintiff, however, also alleges that Advocate is vicariously liable under the doctrine of apparent authority. As our supreme court articulated in *Gilbert*, "[a]pparent authority in an

agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Gilbert*, 156 Ill. 2d at 523. To hold a hospital liable for physician malpractice under the doctrine of apparent authority, plaintiff must show (1) that the hospital held itself out as the provider of health care without informing the patient that the care is provided by independent contractors, and (2) the patient justifiably relied upon the conduct of the hospital to provide care, rather than on a specific physician. *Petrovich*, 188 Ill. 2d at 33-34. If plaintiff can prove these elements, the hospital will be held vicariously liable for the negligent acts of a physician "regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor." *Gilbert*, 156 Ill. 2d at 524.

¶ 23 As to the holding out element, Advocate argues that since plaintiff's husband signed a consent form indicating that "some or all" of the physicians providing services at the hospital are independent contractors, and he is now deceased, the signed consent forms are "the sole legally cognizable determinant" of whether a hospital holds itself out as the provider of health care, quoting *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 131, a Third District case. However, the First District in *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627, 633 (1998), and the Second District in *Churkey v. Rustia*, 329 Ill. App. 3d 239, 244-45 (2002), determined that while a signed consent form is an important factor on the "holding out" issue, it is not always dispositive as to this element. As the court in *Churkey* reasoned, "[t]here certainly could be situations in which a patient signs a consent form containing such a disclaimer but additional facts exist that would create a triable issue of fact as to whether the hospital held the

defendant physician out as its agent." *Id*. at 245. These decisions did not distinguish patients who are deceased from those who file their own complaints. We choose to follow the reasoning in *Churkey* and *James* on this issue.

¶ 24 Although plaintiff's husband did sign consent forms, the language pertaining to the employment status of Advocate's physicians did not clearly state that Dr. Barth, a cardiologist, was an independent contractor. The form states that "*some or all* of the physicians who provide medical services" at the hospital "are not employees or agents of the hospital, but rather independent practitioners**." It further states that "[n]on-employed physicians *may* include, but are not limited to, those practicing emergency medicine, trauma, cardiology, obstetrics, surgery, radiology, anesthesia, pathology and other specialties." (Emphasis added.) Such a disclaimer is ambiguous in that one could assume that some or all or none of the treating physicians are independent contractors, and that independent physicians may or may not include cardiologists. Cases cited by Advocate in support of its position that the consent forms plaintiff's husband signed preclude application of the apparent authority doctrine are distinguishable because the forms in those cases contained clear language of the physicians' independent status. See *Frezados v. Ingalls Memorial Hospital*, 2013 IL App (1st) 121835, ¶ 5 (physicians providing services " 'are not employees, agents or apparent agents' "); *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 4 (form stated that none of the attending physicians are employees); *Churkey*, 329 Ill. App. 3d at 241 (hospital " 'uses independently contracted physicians' " who " 'are not employees' "); *James*, 299 Ill. App. 3d at 633 (physicians on hospital staff " 'are not employees or agents of the hospital' "). Therefore, a question of material fact exists as to whether the consent form adequately informed plaintiff's husband of Dr. Barth's status as an independent physician. See *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 837 (2009).

¶ 25    Furthermore, the record contains support for plaintiff's allegations that Advocate held out Dr. Barth as its employee.   Plaintiff stated that it was her understanding that Dr. Ilbawi and Dr. Barth "worked in the same group" and were "part of the hospital."   In her answer to plaintiff's interrogatories, Dr. Barth stated that Advocate provided her with a lab coat labeled with the hospital's logo, although she did not know if she was wearing it when she treated plaintiff's husband.   However, while working at Advocate Dr. Barth always wore a name tag which identified her as an Advocate employee so she could have access to the hospital unit.   She stated that "[t]here is no question I would have worn my I.D. when caring for [plaintiff's husband]."

¶ 26    Also of relevance is the fact that Advocate's website advertises itself as a medical center which "has earned clinical leadership in more than 60 fields of medicine.   Our team of 1,000+ doctors includes specialists in cardiology, neurosciences, oncology, orthopedics, pediatrics, surgical services, women's health, and emergency medicine.   Our Level I trauma center stands among the most experienced emergency centers in Illinois."   See *Id.* at 841 (such advertisements are relevant to the holding out element since a hospital cannot advertise it has the best physicians and then argue there is no evidence those physicians are employees of the hospital).   For these reasons, we find that a genuine issue of material fact exists as to the holding out element.

¶ 27    Regarding the reliance element, plaintiff contends that she and her husband "knew nothing of Dr. Barth" and believed Dr. Barth's treatment was arranged by Advocate.   Plaintiff satisfies the justifiable reliance element if plaintiff shows reliance upon the hospital to provide medical care, rather than upon a specific physician.   *Gilbert*, 156 Ill. 2d at 525.   In *York v. Rush – Presbyterian - St. Luke's Medical Center*, 222 Ill. 2d 147, 193-94 (2006), our supreme

court addressed whether a patient's selection of a specific physician necessarily precludes recovery under the apparent agency doctrine. The supreme court emphasized that *Gilbert* did not hold that "regardless of the circumstances, the mere existence of a preexisting physician - patient relationship automatically precludes any claim by the patient of reliance upon the hospital for the support staff. Rather, *Gilbert* recognized that *** even when a physician specifically selected for the performance of a procedure directs the patient to that particular hospital, there may be sufficient reliance under the theory of apparent agency for liability to attach to the hospital in the event one of the supporting physicians commits malpractice." *Id.* at 193. Therefore, a plaintiff is not precluded from showing justifiable reliance under these circumstances and the hospital may be found vicariously liable for the negligence of a supporting physician who is not employed by the hospital. *Id*. at 195.

¶ 28    In *McCorry v. Evangelical Hospitals Corp*., 331 Ill. App. 3d 668 (2002), the plaintiff's treating physician referred him to a neurosurgeon from an independent group providing neurosurgical care at Christ Hospital. The plaintiff accepted care from Dr. Hurley, the next available neurosurgeon, and testified that he thought Dr. Hurley was employed by Christ Hospital. *Id*. at 674. In his complaint, the plaintiff alleged that Dr. Hurley's negligence resulted in his paralysis, and sought to hold Christ Hospital vicariously liable for Dr. Hurley's acts. *Id*. at 670. This court found that the plaintiff never met Dr. Hurley before arriving at the hospital, his personal physician did not refer him specifically to Dr. Hurley and he did not select Dr. Hurley; he simply accepted the referral and did not know of Dr. Hurley's independent contractor status. *Id*. We held that the plaintiff "presented sufficient evidence to create a triable issue of fact regarding his reliance on the appearance that Hurley acted as an agent of Christ Hospital." *Id*. at 674.

¶ 29    In her third-amended complaint, plaintiff contended that Dr. Barth was an agent of Advocate thus rendering Advocate vicariously liable for her negligence.    Her husband's long-time physician recommended that he see Dr. Javois for a catheterization procedure.    When he needed another procedure, Dr. Javois referred him to Dr. Ilbawi, who was assisted by Dr. Barth when he performed the procedure on July 30, 2007.    Subsequently, plaintiff's husband experienced shortness of breath and he was brought back to the pediatric surgical heart unit.    At that time, Dr. Barth placed right and left sided chest tubes.    Plaintiff had never spoken with Dr. Barth prior to this procedure.    She never discussed whether the physicians caring for her husband were employed by Advocate; rather, it was her understanding that Dr. Ilbawi and Dr. Barth "worked in the same group" and were "part of the hospital."    She alleged that her husband did not choose Dr. Barth to provide surgical services and that he relied on Advocate to provide complete surgical care.

¶ 30    Plaintiff's testimony regarding the circumstances of her husband's second chest tube placement provides further support for her contention that they relied on Advocate, and not on a specific physician, to provide medical care.    Advocate obtained consent for the procedure from plaintiff by telephone.    The form indicating the consent made no reference to the employment of the treating physicians and bore Advocate's name and logo.    On the form, someone wrote that plaintiff gives her consent with the condition that an adult pulmonologist see her husband. Plaintiff asked for the condition because her husband "was in the children's hospital and they were all pediatricians and pediatric doctors and he was *** having trouble with pulmonary issues."    When asked if she knew of a specific adult pulmonologist at Advocate she wanted her husband to see, plaintiff answered, "No."    We find that a genuine issue of material fact exists regarding the reliance element.    Since questions of material fact exist as to the holding out and

reliance elements of plaintiff's claim based on the doctrine of apparent authority, the trial court erred in granting summary judgment on this issue. Therefore, we reverse and remand the cause for proceedings consistent with this opinion.

¶ 31 The cases cited by Advocate in support of its contrary position, *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508 (2000), and *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, are distinguishable. In *Butkiewicz*, uncontradicted evidence showed that the plaintiff sought treatment from the hospital because his personal physician instructed him to do so, and he had "such high regard" for the physician that he followed his recommendations "religiously." *Butkiewicz*, 311 Ill. App. 3d at 509. The evidence also showed that the plaintiff did not like Christ Hospital, but chose to go there for treatment based on the recommendation of his trusted physician. *Id*. at 514. The plaintiff in *Butkiewicz* clearly did not rely on the hospital in seeking treatment. Likewise, in *Lamb-Rosenfeldt* evidence indicated that the patient would have gone to any facility recommended by her personal physician in order to receive treatment from her. *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 33. Here, plaintiff presented evidence that she and her husband did not know Dr. Barth, nor did they select Dr. Barth for treatment at Advocate.

¶ 32 Advocate also argues that since there is no evidence plaintiff's husband saw Dr. Barth's lab coat or Advocate badge, and plaintiff testified that she could not recall what Dr. Barth wore when she spoke with her, there is no evidence that they detrimentally relied on these items as indicators of Dr. Barth's relationship with the hospital. In *York*, our supreme court noted the traditional detrimental reliance element of apparent agency in other contexts, but reiterated its holding in *Gilbert* that in the medical malpractice context, "the reliance element of a plaintiff's apparent agency claim is satisfied if the plaintiff reasonably relies upon a hospital to provide

medical care, rather than upon a specific physician. [Citation.]" *York*, 222 Ill. 2d at 194. See also *Spiegelman*, 392 Ill. App. 3d at 840 (hospital misapplied the detrimental reliance element which has a limited application in the medical malpractice context). Therefore, the fact that plaintiff did not testify that she or her husband actually saw Dr. Barth wearing her Advocate lab coat or badge does not preclude plaintiff from establishing the holding out or reliance elements of her apparent agency claim.

¶ 33     Finally, Advocate contends that plaintiff cannot show reliance on the hospital to provide medical care because the consent form her husband signed states that his "decision to seek medical care at the hospital is not based upon any understanding, representation, advertisement, media campaign, inference, implication or reliance that the physicians who are or will be treating me are employees or agents of the hospital." However, as this court found in *Churkey* and *James* regarding disclaimers on the employment status of physicians, although such language is an important factor to consider, it is not always dispositive of the issue. As *Churkey* reasoned, there can be situations in which a patient signs a consent form containing a disclaimer "but additional facts exist that would create a triable issue of fact." *Churkey*, 329 Ill. App. 3d at 245. Although *Churkey* addressed disclaimers regarding the independent status of physicians, we find that the same reasoning applies to disclaimers regarding reliance on the hospital's representation of itself as a medical provider.

¶ 34                                    CONCLUSION

¶ 35     For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part, and remanded for further proceedings.

¶ 36     Affirmed in part and reversed in part; cause remanded.