2024 IL App (1st) 221846

No. 1-22-1846

Opinion filed March 28, 2024.

First Division

<hr>

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

<hr>

| | | |
|---|---|---|
| CHRISTINA BRAYBOY, Individually and as Independent Administrator of the Estate of BENJAMIN MATHIS, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2019 L 009806 |
| | ) | |
| ADVOCATE HEALTH AND HOSPITAL CORPORATION d/b/a ADVOCATE GOOD SAMARITAN HOSPITAL, | ) ) ) | The Honorable |
| | ) | Preston Jones, Jr., |
| Defendant-Appellee, | ) | Judge Presiding. |
| | ) | |
| (Michael Antoniolli, M.D., and DuPage Emergency Physicians, Ltd., Defendants). | ) ) | |

<hr>

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Christina Brayboy, brought her two young children to the emergency room at

Advocate Good Samaritan Hospital after her three-year old son, Benjamin Mathis, began

exhibiting flu-like symptoms, including, among other things, a fever, drowsiness, and stiffness.

Benjamin was released from the hospital the following day, but after his symptoms failed to improve and instead got worse, he was transported back to the hospital a few days later where he was pronounced dead due to an untreated bacterial infection.

¶ 2     Thereafter, plaintiff, individually and as independent administrator of her son's estate, filed the instant medical malpractice action against defendant, Advocate Health and Hospital Corporation d/b/a/ Advocate Good Samaritan Hospital ("Advocate"), and defendants Dr. Michael Antoniolli and DuPage Emergency Physicians, Ltd., who are not parties to this appeal. Plaintiff alleged, among other things, that her son's emergency room physician, Dr. Antoniolli, was the actual and apparent agent of Advocate. Advocate disagreed and moved for partial summary judgment on those issues, relying primarily on a consent form signed by plaintiff at the hospital that provided Dr. Antoniolli was an independent contractor, not an agent/employee of Advocate. Plaintiff did not oppose Advocate's motion as it related to actual agency but did oppose it on apparent agency grounds.

¶ 3     Following briefing and arguments from the parties, the circuit court granted Advocate's motion and entered partial summary judgment in the hospital's favor on plaintiff's allegations of actual and apparent agency as to the actions of Dr. Antoniolli. Plaintiff then moved, unsuccessfully, for reconsideration of the court's judgment. The court, however, granted plaintiff's request for an Illinois Supreme Court Rule 304(a) finding that there was no just reason to delay either enforcement or appeal or both.

¶ 4     On appeal, plaintiff contends that the lower court erroneously granted partial summary judgment to Advocate because genuine issues of material fact existed concerning the "holding out" and "reliance" elements of her apparent agency claim, and therefore, whether Dr. Antoniolli

was an apparent agent of Advocate. We agree, and for the reasons that follow, we reverse the circuit court's judgment and remand for further proceedings consistent with this decision.

¶ 5                                    BACKGROUND

¶ 6      The following relevant facts were gleaned from the parties' pleadings, affidavits, depositions, and other supporting documents, and were presented to the court below.

¶ 7      In the late evening on March 25, 2019, plaintiff decided to take her son Benajmin, then three-years old, to the emergency room at Advocate, located in Downers Grove, Illinois, because he had been exhibiting flu-like symptoms, including a fever of 102 degrees, chills, vomiting, lethargy, decreased appetite, and diarrhea. Benjamin also appeared stiff and drowsy. At the time, Benjamin's father, Dominique Mathis, was serving in the miliary and deployed overseas in Iraq, so plaintiff had to take her other young son, Sebastian, then aged two, to the hospital along with Benjamin. Plaintiff chose Advocate because she believed the hospital had a good reputation.

¶ 8      Plaintiff and her sons arrived at Advocate at approximately 9:00 p.m., while Benjamin was officially admitted to the emergency room at 9:27 p.m. He was initially treated by a male nurse and a female physician's assistant. Specifically, Benjamin was given Tylenol and Motrin, his vital signs were taken, blood was drawn, and a polymerase chain reaction (PCR) test was ordered, which ultimately showed a "significantly elevated" procalcitonin level of 11.51. Fluids were also given to Benjamin but he subsequently vomited, leading treaters to administer fluids to him through intravenous therapy (IV). Finally, Benjamin was given a nose swab that tested positive for influenza.

¶ 9      At approximately 10:18 p.m., Dr. Antoniolli was assigned to care for Benjamin in the emergency room. Notwithstanding, almost 45 minutes later around 10:59 p.m., plaintiff was presented with a three-page, single-spaced "Health Care Consent" form that contained 14

numbered sections addressing multiple topics and provided, among other things, that Advocate used "independent contractors or practitioners" to provide hospital services. As relevant here, the last section of that form (section XIV) stated:

"14. INDEPENDENT PHYSICIAN/PROVIDER SERVICES: I ACKNOWLEDGE AND FULLY UNDERSTAND THAT **ONLY THOSE PHYSICIANS/PROVIDERS WHO ARE CLEARLY IDENTIFIED AS ADVOCATE EMPLOYEES ARE EMPLOYEES OR AGENTS OF ADVOCATE HEALTH CARE. NON-EMPLOYED PHYSICIANS/PROVIDERS ARE INDEPENDENT PROVIDERS WHO ARE PERMITTED TO USE THE HOSPITAL FACILITIES TO RENDER MEDICAL CARE AND TREATMENT.** Non-employed physicians include, but are not limited to, those practicing emergency medicine, trauma, cardiology, obstetrics, surgery, radiology, anesthesia, pathology and other specialties. These independent physicians/providers exercise their own medical judgment in treating me or otherwise providing professional services to me. I understand that I should ask my physician any questions I may have about his or her employment status. My decision to seek medical care at the hospital is **NOT BASED UPON ANY UNDERSTANDING, REPRESENTATION, ADVERTISEMENT, MEDIA CAMPAIGN, INFERENCE, PRESUMPTION, OR RELIANCE THAT THE PHYSICIANS PROVIDING CARE AND TREATMENT TO ME ARE EMPLOYEES OR AGENTS OF THE HOSPITAL OR ADVOCATE HEALTH CARE.**"

Even though Benjamin had already received some treatment by that time, plaintiff was told that she had to sign the consent form in order for Benjamin to be treated. The consent form was not

explained to plaintiff nor were any portions of it read to her. Plaintiff, at that point, had been at the hospital for nearly two hours with her two young children. She signed the consent form so that the hospital would continue treating Benjamin. Plaintiff was not given a copy of the consent form after she signed it.

¶ 10    Around 2:00 a.m. the following morning, Dr. Antoniolli discharged Benjamin from the hospital. As will be discussed more below, Benjamin's discharge forms stated, as relevant here:

> "Good Samaritan Hospital would like to thank you for allowing us to assist you with your healthcare needs. The following pages include patient education materials and information regarding your injury/illness.
>
> **IMPORTANT:** We examined and treated you today on an emergency basis only. *** We cannot recognize and treat all injuries or illnesses in one Emergency Department visit. *** If you are looking for a permanent physician for your healthcare needs please call Health Advisor at 1-800-3-ADVOCATE or the phone number on the back of your insurance card."

The discharge forms further stated, in relevant part:

> "THANK YOU FOR CHOOSING GOOD SAMARITAN FOR YOUR EMERGENCY CARE[.]
>
> We are sure that a trip to the ER was not in your plans today. We sincerely hope that we were able to provide you or your family member with VERY GOOD care. Our physicians and clinical staff are committed to quality and service.
>
> Thank you for choosing Good Samaritan Hospital. It is our goal at Good Samaritan Hospital to provide you with **very good** care always."

¶ 11    Meanwhile, the on-duty charge nurse, Brittany Wheeler-Hagberg, informed Dr. Antoniolli that Benjamin's Procalcitonin test came back abnormal at 11.51, a critical value defined by Advocate's lab as "[s]evere sepsis or bacterial shock likely." Dr. Antoniolli asked Nurse Wheeler-Hagberg and another nurse (Marie Jean Gannon) to call and check on Benjamin. According to plaintiff, she received a call from Advocate but was never informed of either Benajmin's elevated Procalcitonin result or the potential for bacterial infection. Nevertheless, the next day on March 27, 2019, plaintiff called Advocate, letting hospital staff know that Benjamin's fever had returned. According to plaintiff, hospital staff informed her the fever was consistent with his virus diagnosis.

¶ 12    Three days later, on March 30, 2019, Benjamin collapsed at home. Benajmin was subsequently transported to Advocate via ambulance where he was pronounced dead. The DuPage County Coroner's Office revealed Benjamin's cause of death to be streptococcus pneumonia.

¶ 13    Several months later, plaintiff filed the instant wrongful death and survival action against Advocate, Dr. Antoniolli and DuPage Emergency Physicians, Ltd. Plaintiff's three-count complaint alleged, in the main, that Dr. Antoniolli was an employee and/or agent of Advocate, and that Dr. Antoniolli's negligence in failing to advise plaintiff to return with Benjamin to the emergency room due to his critical Procalcitonin level, both actually and proximately caused Benjamin's suffering and death.

¶ 14    Advocate subsequently moved for partial summary judgment on the issues of actual and apparent agency with respect to Dr. Antoniolli, asserting that it was not vicariously liable for Dr. Antoniolli's alleged negligence because the consent form signed by plaintiff at the hospital established, as a matter of law, that Dr. Antoniolli was neither an actual or apparent agent of

Advocate, and therefore, summary judgment was appropriate as to those issues. More specifically, Advocate argued that plaintiff could not establish the "holding out" and "reasonable reliance" elements of her apparent agency claim, both of which will be discussed in detail below, because Advocate "affirmatively acted to place [plaintiff] on notice of Dr. Antoniolli's independent contractor status" when it provided plaintiff with the consent form. Advocate argued that because plaintiff signed the consent form, she acknowledged that Dr. Antoniolli was not an employee or agent of the hospital.

¶ 15     In response, plaintiff indicated that she would not proceed on the theory of actual agency with respect to Dr. Antoniolli. As to the theory of apparent agency, however, plaintiff asserted that she was not presented with the consent form until after Benjamin had already received treatment at the hospital and after Dr. Antoniolli had been assigned to care for him, and thus, questions of fact existed as to whether plaintiff could satisfy the "holding out" and "reasonable reliance" elements of her claim. In other words, Advocate had already held itself out as a provider of care and as responsible for its physicians and staff, including Dr. Antoniolli, and plaintiff had relied on that by the time she was presented with the consent form nearly two hours after she arrived at the hospital.

¶ 16     Advocate replied that the consent form was "dispositive evidence that [p]laintiff [did] not – and cannot – prove reliance in this case." Advocate pointed to the language set forth in the consent form that plaintiff signed, stating that plaintiff's "decision to seek medical care at the hospital is **NOT BASED UPON ANY UNDERSTANDING, REPRESENTATION, ADVERTISEMENT, MEDIA CAMPAIGN, INFERENCE, PRESUMPTION, OR RELIANCE THAT THE PHYSICIANS PROVIDING CARE AND TREATMENT TO [HER] ARE EMPLOYEES OR AGENTS OF THE HOSPITAL OR ADVOCATE**

**HEALTH CARE.**" Additionally, Advocate asserted that plaintiff could not meet the "holding out" element of her claim because she signed the consent form, thereby acknowledging that Advocate did not hold Dr. Antoniolli out as one of its employees or agents. Advocate further asserted that plaintiff did "not cite a single case" to support her argument that the timing of the consent form created a question of fact as to this element and that "multiple Illinois cases have upheld summary judgment in favor of the hospital despite the consent being signed after arrival or even after treatment had begun."

¶ 17    Following argument from the parties, the circuit court granted defendant's motion for partial summary judgment as to both actual and apparent agency.[1] The court, however, expressed concern in reaching that conclusion:

> "I personally am disturbed by some of the facts of this case, and I have pointed that out. A mom taking her three-year-old, very sick child to an emergency room with another young child with her, being there for a half hour before being seen, the child having -- given services by Advocate for an hour and a half before being presented with a consent form, that, to me, seems like a circumstance where -- I don't know how many actual people would actually read the consent form under those circumstances when you have a sick child that's throwing up with a fever and then you also have a younger child you're supposed to take care of while you're trying to make sure that your three-year-old gets medical services.
>
> That being said, there's no case law to back up my concerns. There's no – There's no cases that talk about the difficult situation that the mother was in, that

---

[1]As previously stated (see *supra* ¶ 15), plaintiff elected to not proceed on the theory of actual agency, so the lower court did not specifically address that issue in ruling for Advocate on it.

situation being asked to read a three-page form that was put together by lawyers and sign off on it as their extremely sick child is being taken care of. \*\*\* She signed off on the consent form. The language in the consent form is clear, and it is unambiguous. There's no testimony that Dr. Antoniolli was wearing a name tag with Advocate's name on it."

Consequently, the court entered partial summary judgment in favor of Advocate.

¶ 18    Plaintiff then moved to reconsider, as well as for a Rule 304(a) finding that there was no just reason to delay either enforcement or appeal or both. The court denied plaintiff's motion to reconsider but granted her request for a Rule 304(a) finding.

¶ 19    This interlocutory appeal followed.

¶ 20                                    ANALYSIS

¶ 21    Plaintiff contends that the lower court erroneously granted partial summary judgment to Advocate because questions of fact existed concerning both the "holding out" and "reliance" elements of her apparent agency claim against the hospital.

¶ 22    Summary judgment is a drastic remedy which results in the disposition of a case without trial and, consequently, should not be granted unless the pleadings, affidavits, depositions and admissions of file, construed strictly against the moving party, reveal no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 31; see also *Rosenberger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102, ¶ 22 (noting that summary judgment "should not be granted unless the right of the movant is free from doubt"). Simply put, if the record reveals a dispute as to any material issue of fact, summary judgment must be denied regardless of the lower court's belief that the movant would or should prevail at trial. *Ignarski v.*

*Norbut*, 271 Ill. App. 3d 522, 525 (1995). "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Monson v. City of Danville*, 2018 IL 122486, ¶ 12.

¶ 23    Additionally, in reviewing a motion for summary judgment, courts must strictly construe the record against the movant and liberally in favor of the nonmovant. *Id*. While the nonmovant need not prove her entire case at the summary judgment stage, she must present some evidence that would arguably entitle her to recovery at trial. *Manilow*, 2016 IL App (1st) 150397, ¶ 31. Finally, as this matter is before us from the entry of partial summary judgment, our review is *de novo*. *Id*.

¶ 24    Illinois law recognizes the doctrine of apparent authority, which refers to a type of agency relationship. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523 (1993). Under that doctrine, a principal will be liable not only for the authority that he actually gives to another, but also for the authority that he appears to give. *Id*. Stated differently, apparent authority is authority which the principal knowingly permits the agent to assume, or authority which the principal holds the agent out as possessing. *Id*. "It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Id*. Where the principal creates the appearance of authority, he cannot then deny agency " 'to the prejudice of an innocent party, who has been led to rely on the appearance of authority in the agent.' " *Id*. at 524 (citing *Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.*, 157 Ill. 554, 565 (1895)).

¶ 25    As our supreme court delineated in *Gilbert*, to prevail on a claim of apparent agency against a hospital under the doctrine of apparent authority, a plaintiff must show that (1) the

hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was the hospital's employee or agent, (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them, and that (3) the plaintiff relied upon the conduct of the hospital or its agent, consistent with ordinary care and prudence. *Gilbert*, 156 Ill. 2d at 525; see also *Yarbrough v. Northwestern Memorial Hospital*, 2017 IL 121367, ¶ 38 (noting that *Gilbert* set forth the elements necessary to prove apparent authority against a hospital, which are a "holding out" element by the hospital and "justifiable reliance" element by the plaintiff (internal quotation marks omitted.)). "If plaintiff can prove these elements, the hospital will be held vicariously liable for the negligent acts of a physician 'regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor.' " *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶ 22 (quoting *Gilbert*, 156 Ill. 2d at 524).

¶ 26    Moreover, to satisfy the first two elements, known as the "holding out" elements on the part of the hospital, the plaintiff need not show an express representation by the hospital that the person alleged to be negligent is an employee. *Gilbert*, 156 Ill. 2d at 525. "Rather, the element is satisfied if the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors." *Id*. Likewise, while a signed consent form is an important factor in determining the "holding out" issue, it is not dispositive of that element. See *Hammer*, 2016 IL App (1st) 143066, ¶ 23; *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 22; *Churkey v. Rustia*, 329 Ill. App. 3d 239, 244 (2002); *James by James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627, 633 (1998). As the court in *Churkey* noted, "[t]here certainly could be situations in which a patient

signs a consent form containing such a disclaimer but additional facts exist that would create a triable issue of fact as to whether the hospital held the defendant physician out as its agent." *Churkey*, 329 Ill. App. 3d at 245. Similarly, a consent form will not preclude recovery under an apparent agency theory if the form is ambiguous or potentially confusing as to whether the plaintiff's treating physician was the hospital's agent or an independent contractor. *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶ 42.

¶ 27    The "justifiable reliance" element of an apparent agency claim, on the other hand, is satisfied if the plaintiff relies upon the hospital to provide complete emergency room care, instead of a specific physician. *Gilbert*, 156 Ill. 2d at 525. In this regard, it is important to note that:

> " '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care – from blood testing to radiological readings to the endless medical support services – will be provided by the hospital through its staff.' " *Id*. at 525-26 (citing *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 211-12 (1988)); see also *Grewe v. Mt. Clemens General Hospital*, 404 Mich. 240, 251, 273 N.W. 2d 429, 433 (1978) (stating, "[i]n our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical

ailments or merely viewed the hospital as the situs where his physician would treat him for his problems").

¶ 28    After reviewing the record before us and construing the evidence strictly against Advocate and liberally in favor of plaintiff, as we must, we conclude that genuine issues of material fact existed on both the "holding out" and "reliance" elements of plaintiff's apparent agency claim despite the consent form, and thus, summary judgment was inappropriate.

¶ 29    Before proceeding with our application of the law to the facts of this case, we must first address an issue of first impression raised in plaintiff's appellate brief: when does a notice or consent form have to be given by a hospital to a patient to be effective? Plaintiff argues that the timing of the consent form is crucial in determining whether such a form is dispositive of a claim of apparent agency against a hospital. According to plaintiff and other persuasive authority, which we will discuss below, the timing of the notice or consent form "must be sufficient such that it can be a realistic factor in a patient's choice to obtain treatment at the hospital." We agree.

¶ 30    Initially, it is the hospital's burden to put their patients on notice of the independent contractor status of the professionals with whom the patients might come into contact. *Kane v. Doctors Hospital*, 302 Ill. App. 3d 755, 762 (1999). While a notice or consent form may notify the patient that a physician is an independent contractor, rather than the hospital's agent/employee, that notice or consent form should be presented in a meaningful way, at a meaningful time, in order to sufficiently disclaim reliance by the patient. See, *e.g.*, *Fragogiannis*, 2015 IL App (1st) 141788, ¶ 22 (noting that "after-the-fact 'consent' " and disclaimers of employee status that are given last-minute or without meaningful time will not allow hospitals to avoid application of apparent authority). Courts in other states have addressed this exact issue.

¶ 31    For example, the Ohio Supreme Court in *Clark v. Southview Hospital & Family Health*

*Center*, 628 N.E. 2d 46 (Ohio, 1994), engaged in a comprehensive analysis of apparent agency law throughout the country, touching on the framework laid out in *Gilbert*, public policy issues concerning modern day hospital care and the fact that "[t]he public, in looking to the hospital to provide such care, is unaware of and unconcerned with the technical complexities and nuances surrounding the contractual and employment arrangements between the hospital and the various medical personnel operating therein." *Id*. at 53. The court continued, noting that "often the very nature of a medical emergency precludes choice." *Id*. Relevant to our analysis here, the *Clark* court emphasized, "[a]s to notice to the plaintiff that care is being provided by independent medical practitioners, we stress that such notice, to be effective, must come at a meaningful time." *Id*. at 54.

¶ 32    The South Carolina Supreme Court in *Simmons v. Tuomey Regional Medical Center*, 533 S.E. 2d 312, 320 (S.C. 2000), reached a similar conclusion. There, the *Simmons* court found:

> "The Ohio cases illustrate what we perceive to be the likely trend among the many courts that have adopted an apparent agency theory in these cases. Under that trend, hospitals will not be allowed to escape liability by giving last-minute notice of independent-contractor practitioners through admission forms or emergency room signs. The result is that hospitals may be held liable for the malpractice of their emergency room physicians, regardless of whether it is through a theory of apparent agency or nondelegable duty." *Id*. at 320.

¶ 33    In a similar fashion, the Indiana Supreme Court in *Sword v. NKC Hospitals, Inc.*, 714 N.E. 2d 142 (Ind. 1999), drawing on *Clark* and *Gilbert*, found that:

> "A hospital generally will be able to avoid liability by providing meaningful written notice to the patient, acknowledged at the time of admission. *** Under some

circumstances, such as in the case of a medical emergency, however, written notice may not suffice if the patient had an inadequate opportunity to make an informed choice." *Id*. at 152.

Additionally, the *Sword* court, construing section 429 of the Restatement (Second) of Torts, emphasized that, "a trier of fact must focus on the reasonableness of the patient's belief that the hospital or its employees were rendering health care. This ultimate determination is made by *considering the totality of the circumstances*, including the actions or inactions of the hospital, as well as any special knowledge the patient may have had about the hospital's arrangements with its physicians." (Emphasis added.) *Id*.

¶ 34    The Supreme Court of Tennessee in *Boren v. Weeks*, 251 S.W. 3d 426 (Tenn. 2008), relying in part on *Simmons*, *Sword* and *Gilbert*, also found that:

"' 'A hospital generally will be able to avoid liability by providing meaningful written notice to the patient, acknowledged at the time of admission.' Thus the issue often becomes, as it does here, what constitutes 'meaningful' notice. The court in *Sword* recognized that 'under some circumstances, such as in the case of a medical emergency,…written notice may not suffice if the patient had an inadequate opportunity to make an informed choice.' " *Id*. at 436. (quoting *Sword*, 714 N.E. 2d at 152).

¶ 35    Similarly, the Maryland court of appeals in *Williams v. Dimensions Health Corp.*, 279 A. 3d 954 (Md. 2022), reviewed various apparent agency cases, many of which we have addressed already, and noted with respect to meaningfulness that:

"Any notice that an emergency room physician is an independent contractor that is designed to allow the hospital to avoid vicarious liability must be made in a meaningful

way at a meaningful time – *i.e.*, when it can be a factor in a patient's choice to obtain treatment at the hospital." *Id*. at 964.

The *Williams* court continued, emphasizing that "[n]otice provided only in a written consent form may be insufficient." *Id*. (citing cases where consent forms given at the last-minute or which were lengthy and seldom explained to patients were insufficient for finding notice as a matter of law).

¶ 36 We agree with these national trends concerning apparent agency law that a notice or consent form, to be effective, must be given when the patient still has a reasonable opportunity to obtain treatment elsewhere if he or she chooses not to sign the form. While the cases may not be binding precedent, they certainly are persuasive.[2] As applied to this case, we find that whether the consent form was presented to plaintiff at a meaningful time and provided meaningful notice to her that Dr. Antoniolli was an independent contractor, rather than an agent of Advocate, is a material issue of fact, precluding summary judgment. See, *e.g.*, *Williams v. Tissier*, 2019 IL App (5th) 180046, ¶ 46 (concluding whether the disclosure provided meaningful notice to the plaintiff that the physician was an independent contractor was a question of fact of whether the plaintiff presented sufficient evidence to create material issues of fact as to whether the physician was an agent of the hospital, such as advertisements and signage showing hospital physicians wearing the same logo and colors as the hospital and the plaintiff's own testimony that she researched the hospital's services that she received on its website).

¶ 37 In the case before us, plaintiff showed that she relied on Advocate when her son was treated by an allegedly negligent doctor. Specifically, plaintiff's complaint alleged that she relied

---

[2]There are other out-of-state cases discussing the issue of when a consent form must be given to a patient to be effective that are in agreement with those mentioned above, but we need not address them all here.

on Advocate, which had "marketed its healthcare organization *** as providing quality and reputable care and treatment *** advertised in print media," to provide her son "with full and complete medical care" including, "necessary tests and services to protect him from severe injury and/or death." Plaintiff also alleged that Benjamin did not have a pediatrician to follow-up with at the time because the family was in the process of obtaining one in the area. Furthermore, plaintiff testified that, while she did not know any of the doctors, nurses or physicians from any prior encounters, she took Benjamin to Advocate for a number of reasons, including that the "[Advocate system] had a good reputation." This testimony was supported by other evidence showing the hospital engaged in an extensive, coordinated marketing campaign throughout the Chicagoland area, to highlight Advocate's supposedly reputable hospital system.

¶ 38     Christine Priester was the Director of Marketing for Advocate Healthcare between 2012 and 2014, the Vice President of Marketing and Digital Strategy for Advocate Healthcare between 2014 and 2018, and the System Vice President Brand for Advocate Aurora Health since 2018. Ms. Priester testified that, between 2014 and 2018, she managed an annual marketing budget of $15 million. Additionally, the in-house brand strategy team consisted of 30 to 40 individuals, and outside agencies were used to create and manage marketing and advertising for the hospital system. Advocate advertised through, among other things, print advertisements, bus stop advertisements, billboards on all major highways in the Chicagoland area, suburban roads in the area, television commercials, on-site signage at pharmacy clinics, direct mailers, digital advertisements, social media sites, and even through strategic partnerships with Chicago sports teams. Notably, many of those ads referred to doctors as employees/agents of Advocate: "Advocate Good Samaritan Hospital associates and physicians," "our top doctors," and "Find an Advocate physician…" Several ads also contained photographs of physicians wearing lab coats

or other clothing that read: "Advocate Heart Institute," "Advocate Healthcare," or "AMG neurosurgery." One billboard for Advocate Medical Group read, "Over 1,200 top docs," with pictures of a group of physicians in the background.

¶ 39    According to Ms. Priester, the "Advocate Healthcare brand is the No. 1 brand [in] awareness and familiarity in Chicagoland," an indicator that was determined by a survey of consumers. Ms. Priester admitted that was "an indication that the marketing and advertising efforts have been effective in the Chicagoland area." Those efforts were clearly effective in this case as the hospital's "good reputation" was one of the reasons that plaintiff took Benjamin there to be treated. See, *e.g.*, *Gilbert*, 156 Ill. 2d 511, 521 ("Generally, people who seek medical help through the emergency room facilities of modern-day hospitals are unaware of the status of the various professionals working there. Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while there, it is the reputation of the hospital itself upon which he would rely" (Internal quotation marks omitted.)).

¶ 40    Where, as here, "a plaintiff shows that [s]he relied in part on the hospital when [s]he accepted treatment from an allegedly negligent doctor, [s]he has met the reliance element of the proof needed to hold the hospital liable under the theory of apparent agency." *McCorry v. Evangelical Hospitals Corp.*, 331 Ill. App. 3d 668, 675 (2002). At the very least, plaintiff here presented evidence that Advocate marketed itself in such a manner that could lead a reasonable person to conclude that the hospital accepted responsibility for its choice of doctors based on its extensive advertising campaign, and therefore, the doctors acted as the hospital's agents. This clearly raises a question of fact as to whether Advocate held itself out as a provider of emergency

room care without adequately informing plaintiff that the care was provided by independent contractors.

¶ 41  Although plaintiff signed a consent form, additional facts existed that created a triable issue of fact as to whether Advocate held Dr. Antoniolli out as its agent, such as the fact that the three-page, single-spaced form was presented to plaintiff roughly two hours after she arrived at the hospital with her two young children, one of whom was very sick and vomiting, an hour and a half after Benjamin was officially admitted to the emergency room, nearly 45 minutes after Dr. Antoniolli had been assigned to care for him, and after Benjamin had already been treated by hospital personnel. See, *e.g.*, *First Midwest Bank v. Ottawa Regional Hospital & Healthcare Center*, 2023 IL App (3d) 220008, ¶ 61 (McDade, J., concurring in part and dissenting in part) (in dissenting from the majority's finding that summary judgment was properly granted in favor of the hospital as to apparent agency, Justice McDade noted that hospital patients are often "in medical distress," and consequently, it is unlikely that they will "carefully examine a three-page document *** or understand the nuances of unstated suggestions unless the document's significance is explained to them). While defense counsel stated at oral argument before this court that plaintiff still had a choice when the form was presented to her and the choice was to leave Advocate, any choice she might have had was illusory at best.

¶ 42  Moreover, plaintiff's discharge instructions largely contradicted the consent form wherein they stated, "Good Samaritan Hospital would like to thank you for allowing *us* to assist you with your healthcare needs." (Emphasis added.) Additionally, the instructions stated,

> "**IMPORTANT:** *We* examined and treated you today on an emergency basis only. *** *We* cannot recognize and treat all injuries or illnesses in one Emergency Department visit. *** If you are looking for a permanent physician for your healthcare

needs please call Health Advisor at 1-800-3-ADVOCATE or the phone number on the back of your insurance card." (Emphasis added.)

The discharge instructions further stated,

"THANK YOU FOR CHOOSING GOOD SAMARITAN FOR YOUR EMERGENCY CARE[.]

*We* are sure that a trip to the ER was not in your plans today. *We* sincerely hope that *we* were able to provide you or your family member with VERY GOOD care. *Our* physicians and clinical staff are committed to quality and service.

Thank you for choosing Good Samaritan Hospital. It is *our* goal at Good Samaritan Hospital to provide you with **very good** care always." (Emphasis added.)

Those instructions contained Dr. Antoniolli's name but did not indicate that he was an independent contractor, rather than an agent/employee of the hospital. Moreover, it is important to note that plaintiff was given a copy of the discharge instructions but was not given a copy of the consent form that she signed.

¶ 43 These additional facts clearly present triable issues of fact as to whether Advocate held itself out as a provider of emergency room care without sufficiently and meaningfully informing plaintiff that such care was provided by an independent contractor and whether plaintiff relied on Advocate to provide complete emergency room care, rather than specifically relying on Dr. Antoniolli for said care. *Cf. Prutton v. Baumgart*, 2020 IL App (2d) 190346, ¶ 55 (finding no genuine issue of material fact on the issue of whether the hospital held the independent-contractor-physician out as its agent where the plaintiff signed an unambiguous consent form and did not "identify any other circumstances that would" create a genuine issue of material fact on the issue besides hospital advertisements referring to and picturing the non-employed physician);

*Stelzer v. Northwest Community Hospital*, 2023 IL App (1st) 220557-U, ¶ 32 (affirming partial summary judgment to the defendant-hospital on the issue of apparent agency despite that the hospital's advertisements "could lead a reasonable person to believe that [the hospital] actually employed these physicians" where the plaintiff signed a consent form *and* there were signs in the hospital's reception areas that also informed the plaintiff that the hospital's medical staff were "independent practitioners and not [hospital] employees or agents"). These issues must be decided by a jury, not by a court of law at the summary judgment stage.

¶ 44    Because we determined there were issues of fact precluding summary judgment with respect to the "holding out" and "reliance" elements of plaintiff's apparent agency claim against Advocate and whether the consent form was provided to plaintiff in a meaningful way, at a meaningful time, we need not address plaintiff's alternative argument that the consent form was ambiguous and confusing so as to create a triable issue of fact on that basis.

¶ 45    Finally, as plaintiff's appellate counsel aptly observed in the reply brief, defendant in its appellate brief largely avoided addressing plaintiff's opening arguments, particularly the arguments of first impression concerning when a consent form must be given to a patient to be effective. Instead, defendant set forth, in a bullet-like fashion, a string of citations to Illinois caselaw wherein the plaintiff signed a consent form and summary judgment was affirmed as to apparent agency. Many of those cases, however, involve different fact patterns than that here. Regardless, as set forth herein, both state and national apparent agency law, as applied to the specific facts of this case, support our determination that triable issues of fact precluding summary judgment existed.

¶ 46    Based on the foregoing, and after construing the pleadings, depositions and other evidence strictly against Advocate and liberally in favor of plaintiff, as required, we conclude

that there is a genuine issue of material fact as to whether Dr. Antoniolli was Advocate's apparent agent. The circuit court therefore erred in granting partial summary judgment to Advocate on the issue of apparent agency.

¶ 47                                    CONCLUSION

¶ 48     For the reasons set forth above, we reverse the judgment of the circuit court granting partial summary judgment in favor of Advocate and remand for further proceedings.

¶ 49     Reversed and remanded.